THE HERMAN-MCLEAN CO. *v.* CARPENTER ET AL., D. B. A. EUREKA MILLING CO.

(Decided November 4, 1929.)

*Messrs. Davis, Young & Vrooman,* for plaintiff in error.

*Messrs. Wilkin, Fernsell, Fisher & Limbach* and *Messrs. Dustin, McKeehan, Merrick, Arter & Stewart,* for defendants in error.

VICKERY, P. J.  This cause comes into this court on a petition in error to the common pleas court of· Cuyahoga county, the purpose being to reverse a judgment that was rendered against the Herman-McLean Company in the court below in the sum of $803.33.

From the record we learn that the Herman-Mc-Lean Company are wholesalers of feed, grains and so forth, and that the defendants in error, two men by the name of Carpenter, doing business as the Eureka Milling Company, were engaged in the milling business, retailing corn and feed; that prior to the events which led up to this lawsuit the Herman-McLean Company had purchased a carload of corn at Scott, Ohio, which had been shipped to them at their yard in Cleveland, Ohio, and had been in the yard some six or seven days; and that they undertaking to market this corn opened up communication with the Eureka Milling Company at New Philadelphia over the telephone, which conversation was later confirmed by letter.  The effect of this was that a contract of sale was entered into, whereby the Eureka Milling Company became the purchaser of this carload of corn.  It was sold by description, and according to a certain quality that was men-

tioned over the telephone and in the letter, as follows:

"This confirms our telephone conversation of this morning resulting in the sale to you of one car of Yellow Ear Corn which is now in Cleveland, and according to Cleveland Grain and Hay Inspection inspects No. 3 Yellow, 21% moisture. This car sold to you at $1.28 a bushel of 70 lbs. delivered to New Philadelphia via Baltimore & Ohio Railroad, draft to be made through the Ohio Savings and Trust Company, New Philadelphia."

Pursuant to that letter the carload of corn was started on its way to New Philadelphia, and the draft for the amount of the carload of corn at the price mentioned in the letter, together with the bill of lading, was sent to New Philadelphia to the bank with directions to notify the Eureka Milling Company of its arrival. The milling company being apparently anxious to get the corn, and learning that the carload of corn had arrived, went to the bank to pay the draft and get the bill of lading, but it had not come, and so in order to expedite matters it gave to the railroad company a certified check for the amount of the draft and took possession of the car. It immediately discovered that by reason of a leaky condition of the roof of the car in which the corn was stored, the corn had become wet, damp, and moldy. The Eureka Milling Company, however, accepted the car and notified the Herman-McLean Company very shortly, within three or four days, of its condition, and it did everything possible to lessen the loss by drying the corn and attempting to dispose of it, but in most every instance the corn was returned to it by the customers.

In the meantime, the bill of lading and draft had arrived at the bank in New Philadelphia and the Eureka Milling Company went. over and got the draft and bill of lading, and then it was, I believe, that it notified the McLean Company of the bad condition of the corn. There is some evidence in the record to show that the attention of the freight agent was called to the condition of the corn at New Philadelphia, and it was learned that the car in which it was shipped had leaked and was leaking, the weather being wet and rainy, and so forth.

Some correspondence apparently took place between the McLean Company and the Eureka Milling Company as to the best way of having the matter adjusted, and some suggestions were made by the McLean Company. However, the negotiations did not result in any adjustment. The Eureka Milling Company having paid for the corn, and having been damaged because of its condition, brought an action against the McLean Company—an action for breach of warranty—claiming that the representations in the letter were a warranty as to its quality and condition, and that it having paid for the car of corn could avail itself of the remedy for breach of warranty, and such was the nature of the suit.

Now from the manner in which this carload of corn was purchased by the Eureka Milling Company, and shipped to it by the McLean Company, it is apparent that under the sales code the title did not pass until it had reached New Philadelphia, because it was shipped to the McLean Company with instructions to notify the Eureka Milling Company. Rule 5 of Section 8399, General Code, reads as follows:

"If a contract to sell requires the seller to deliver

the goods to the buyer, or at a particular place, or to pay the freight or cost of transportation to the buyer, or to a particular place, the property does not pass until the goods have been delivered to the buyer or reached the place agreed upon.''

We think under the provisions of this section the title to the goods remained in the McLean Company until they had reached New Philadelphia, and had been accepted by the Eureka Milling Company. The Eureka Milling Company lost no time in taking the goods from the car, so they could not have been damaged there. The damage then must have resulted to this corn from the time that it left Scott, Ohio, including the time it stood in the yard of the McLean Company in Cleveland, until it reached New Philadelphia, when it was accepted by the Eureka Milling Company.

Now an examination of the inspection card will show that the Grain and Hay Inspection Bureau of Cleveland intimated that it would be subject to further inspection. It must be remembered that the car remained in the yards of the McLean Company about six days after the inspection, and even if the corn was in good condition at such time, it might not have been in that condition when it was finally dispatched to New Philadelphia. At least, the evidence in this case shows beyond any doubt that the corn was not in the condition represented in the letter at the time the Eureka Milling Company took it out of the car in New Philadelphia; that it was practically unfit for use, and had, I believe, about 49 per cent. of moisture instead of 21 per cent.; and, as already stated, some of it was moldy and unfit for use, and the milling company tried its best to recondition it to make it salable.

Now the Eureka Milling Company had at least three remedies: One would be to reject the corn entirely and rescind the contract because the corn did not come up to the warranty contained in the letter; another would be to refuse to pay and recoup for damages, if suit were brought; and the other would be, having paid the money, to bring an independent suit to recover damages for breach of warranty. The latter remedy seems to have been pursued, and we think from this record that there was a warranty contained in the letter as to the condition and quality of this corn, and we think that the warranty had not been lived up to; that is, there was a breach of warranty with respect to the condition and quality of the corn, and that was through no fault of the Eureka Milling Company but solely through the negligence either of the McLean Company or of the railroad company over which the corn was transported.

The Eureka Milling Company having brought its suit and recovered damages, which do not seem to be excessive, and it claiming that it is within its legal rights, we do not see why the verdict should be disturbed. It may be that the McLean Company had, or perhaps now has, an action against the railroad company for furnishing a car that was not fit for the purpose of shipping corn during that season of the year, but that is aside from the purpose in this lawsuit.

We think the plaintiff below was clearly within its legal rights, and we can see no error in the rulings or in the judgment of the court below in this case. It will therefore be affirmed.

*Judgment affirmed.*

SULLIVAN and LEVINE, JJ., concur.